# United States Court of Appeals
## For the First Circuit

No. 98-1538

UNITED STATES OF AMERICA,

Appellee,

v.

CARLOS RIVERA-RUIZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Torruella, Chief Judge,
Lynch and Lipez, Circuit Judges.

Ramón M. González for appellant.
Ruth J. Vernet, with whom Guillermo Gil, United States Attorney, Jorge E. Vega-Pacheco, Assistant United States Attorney, Chief, Criminal Division, and Camille Vélez-Rivé, Assistant United States Attorney, were on brief for appellee.

April 5, 2001

**LIPEZ, Circuit Judge**.  Carlos Rivera-Ruiz appeals his conviction for one count of conspiracy to possess with intent to distribute cocaine.  He also appeals his sentence of 121 months.  Rivera claims that the evidence presented at trial, consisting largely of the testimony of one cooperating witness about one transaction, was insufficient to convict him of participating in a conspiracy.  He also argues that there was an impermissible variance between the allegations in the indictment and the proof offered at trial, and that the prosecutor's closing argument denied him due process of law.  Finally, he claims that the district court made an error in sentencing.  Although we acknowledge the closeness of the sufficiency issue, we affirm the conviction and sentence.

## I. Background

Carlos Rivera-Ruiz ("Rivera") was charged in count six of a ten-count indictment charging various individuals with violations of federal drug laws.  While some of the other counts charged substantive drug offenses, Rivera was charged with conspiracy to distribute cocaine in violation of 21 U.S.C. §§

841(a)(1)[1] and 846.[2]   The indictment alleged that Rivera,

together with Jaime Padilla Rodríguez ("Padilla"), Jorge Arroyo-

Rivera ("Arroyo"), and two unindicted co-conspirators,[3] conspired

to possess and distribute cocaine.  All of the other individuals

named in the indictment pled guilty.  Trial for Rivera commenced

in mid-September, 1997.  Following a three-day trial, the jury

returned a verdict of guilty.  The court sentenced Rivera to 121

months in prison.

## II. The Sufficiency of the Evidence

Rivera moved for a judgment of acquittal after the

government rested and again at the close of all the evidence.

See Fed. R. Crim. P. 29.  The district court denied that motion,

and we review that ruling de novo.  See United States v.

Hernández, 146 F.3d 30, 32 (1st Cir. 1998).  In considering the

evidence presented at trial, we view the facts and draw all

---

[1] 21 U.S.C. § 841(a)(1) provides that "it shall be unlawful
for any person knowingly or intentionally . . . to manufacture,
distribute, or dispense, or possess with intent to manufacture,
distribute, or dispense, a controlled substance."

[2] 21 U.S.C. § 846 provides: "Any person who attempts or
conspires to commit any offense defined in this subchapter shall
be subject to the same penalties as those prescribed for the
offense, the commission of which was the object of the attempt
or conspiracy."

[3] Unindicted co-conspirator No. 1 was identified as William
Negrón Zapata ("Negrón"), and unindicted co-conspirator No. 2
was identified as Víctor Ramírez de Arellano ("Ramírez").

reasonable inferences in favor of the prosecution. See United States v. Baldyga, 233 F.3d 674, 678 (1st Cir. 2000). We have a limited role in reviewing this evidence.

> An appellate court plays a very circumscribed role in gauging the sufficiency of the evidentiary foundation upon which a criminal conviction rests. The court of appeals neither weighs the credibility of the witnesses nor attempts to assess whether the prosecution succeeded in eliminating every possible theory consistent with the defendant's innocence.

United States v. Woodward, 149 F.3d 46, 56 (1st Cir. 1998) (quoting United States v. Noah, 130 F.3d 490, 494 (1st Cir. 1997)). Our inquiry is only whether "the guilty verdict finds support in a 'plausible rendition of the record.'" United States v. Echeverri, 982 F.2d 675, 677 (1st Cir. 1993) (quoting United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992)).

**A. The Evidence**

The evidence presented by the government at Rivera's trial consisted largely of the testimony of William Negrón Zapata, who testified that he met Rivera in 1986 through a mutual friend, Ricardo Maldonado. He further stated that he saw Rivera on several occasions in 1986, as well as in 1990. The two would meet at Rivera's home, and Negrón stated that Rivera sometimes visited him at his automobile repair shop which he operated out of his home. He successfully identified

-4-

photographs of property owned by Rivera at trial and knew that Rivera also ran an automobile repair shop out of his home.

Regarding the transactions charged in the indictment, Negrón testified that he agreed to purchase two kilograms of cocaine on April 15, 1991 from Amador Irizarry Sanabria, a man he had known since 1989 and had purchased drugs from on prior occasions. Negrón paid him a total of $26,000 for the drugs, or $13,000 for each kilogram. Jaime Padilla Rodríguez, a friend of Irizarry's, arrived at Negrón's house that day to deliver the cocaine. Because Negrón had customers in his auto repair shop when Padilla arrived, he asked Padilla to leave and follow a specified road to a point where they could exchange the cocaine more privately. Padilla complied with these instructions. Negrón, accompanied by his personal bodyguard, Jorge Arroyo Rivera, met Padilla at the specified location and collected the package of cocaine.[4]

After obtaining the two kilograms of cocaine from Irizarry, Negrón contacted his friend Víctor Ramírez de Arellano, an attorney. Negrón first met Ramírez in December 1989 when he retained him to represent his uncle in a criminal matter. Ramírez had purchased drugs from Negrón on several

---

[4] Negrón's testimony regarding this transaction was not corroborated by other witnesses. Padilla died in 1996, one year before the trial.

occasions beginning in February 1991. On April 15, Ramírez agreed to buy one kilogram of cocaine for $13,500. Ramírez corroborated Negrón's account of this transaction at trial.

Negrón also called Rivera on the afternoon of April 15, and Rivera agreed to buy the other kilogram of cocaine from him for $13,500. The two agreed that they would meet at Rivera's house at the Anones Ward in Las Marías the following morning. The prosecution did not offer a record of this phone call at trial, and Negrón testified on cross-examination that he did not remember what phone he used to place the call. Early on April 16, Negrón arrived at Rivera's home, unaccompanied, and gave him the drugs in exchange for $13,500. He stated that this transaction occurred in a living room on the first floor of Rivera's house and that only he and Rivera were present when they exchanged the drugs.

After leaving Rivera's house, Negrón called Padilla from his cellular phone and asked him to bring an additional two kilograms of cocaine from Irizarry. As before, Padilla arrived at Negrón's home and auto shop and the two then left separately to meet at the same specified location. Negrón gave Padilla $26,000 for the two kilograms of cocaine he had received the day before, and Padilla gave him an additional two kilograms.

Negrón sold one kilogram to Roberto Rivera Ortiz, to whom he had sold cocaine on several prior occasions. He sold the other kilogram to Ramírez the following morning, April 17. Ramírez testified that he then sold the cocaine to two other people. Padilla arrived at Negrón's house to collect the $26,000 payment for the cocaine after Negrón made these sales.

Negrón's testimony about his drug transactions in April 1991 was uncorroborated, except by Ramírez who corroborated Negrón's account of their two transactions. However, Negrón's testimony was also uncontradicted. The only witness offered by Rivera was Ramonita Malavé, his ex-wife. The two were married for 18 years and divorced in 1989, two years prior to the events described in the indictment. Malavé testified that a man named José López, together with his family, was renting the first floor of the home owned by Rivera where Negrón alleged that the transfer of cocaine had occurred. She stated that López moved from the first floor of the home to the second floor sometime after April 1991, but she was uncertain of the exact date when questioned on cross-examination. Malavé also testified that Rivera was able to purchase and maintain several properties because of the rents he collected and the income he earned from his automobile repair shop.

## B. Applicable Principles

To establish Rivera's guilt on the conspiracy charge, the government needed to show "the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy." United States v. Morillo, 158 F.3d 18, 23 (1st Cir. 1998). Rivera conceded, both below and on appeal, that a conspiracy to distribute cocaine existed. He only disputes his own involvement with that conspiracy.

Rivera's voluntary participation in the conspiracy could have been demonstrated by evidence that he intended to enter into an agreement with the other parties to the conspiracy and that he intended "to effectuate the commission of the substantive offense." United States v. Piper, 35 F.3d 611, 615 (1st Cir. 1994). "The agreement itself 'need not be express, but may consist of no more than a tacit understanding.'" Echeverri, 982 F.2d at 679 (quoting United States v. Glover, 814 F.2d 15, 16 (1st Cir. 1987)). The proof of Rivera's involvement in the conspiracy "may consist of indirect evidence, including reasonable inferences drawn from attendant circumstances." Id.

In determining whether a single conspiracy exists, we have considered whether the participants shared a common goal. See United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999).

The common goal of selling cocaine for profit satisfies this element. See id. We have also examined whether there was overlap among the participants to the conspiracy. See id. Such overlap exists where a conspiracy is marked by the "pervasive involvement of a single 'core conspirator,'" or "hub character." Id. (quoting United States v. Wilson, 116 F.3d 1066, 1076 (5th Cir. 1997)).

There is no need for a conspirator to know the other participants in the conspiracy. See United States v. Sepúlveda, 15 F.3d 1161, 1191 (1st Cir. 1993); United States v. Nueva, 979 F.2d 880, 884 (1st Cir. 1992) ("[T]he government need not prove that the defendant knew all the details or all the members of the conspiracy."). Additionally, there is no requirement that a conspirator realize the full extent of the conspiracy to be found guilty. See United States v. Walters, 904 F.2d 765, 770 (1st Cir. 1990). As we said in Portela, the requisite level of interdependence among conspirators exists where the defendant realized that the success of his own drug transactions depended on the ability of others to obtain drugs from suppliers and to sell them for profit to other purchasers:

> [T]here was sufficient evidence for the jury to conclude that [the appellant] understood that his transaction's success depended on the health of the trafficking and distribution network focused around [the seller of drugs], which in turn depended on

> continued transactions between [the seller]
> and other suppliers.  Although these other
> suppliers were perhaps unknown individually
> to [the appellant], the jury could have
> reasonably inferred that he must have been
> aware of their existence.

Portela, 167 F.3d at 697.  Ultimately, our analysis of whether Rivera was part of a conspiracy does not rest on any particular element because "this court has looked beyond any . . . lists of factors to the 'totality of the evidence' in determining whether there is factual support for a finding of a single conspiracy."  Id. at 696 (quoting United States v. Drougas, 748 F.2d 8, 17 (1st Cir. 1984)).

## C. Applying the Principles to the Evidence

### 1. Transaction between Negrón and Rivera

Rivera claims that Negrón's uncorroborated testimony regarding the single transaction between them is unreliable because Negrón agreed to cooperate with the government.  However, credibility determinations are uniquely within the province of the jury, and we do not evaluate those judgments on appeal.  See Woodward, 149 F.3d at 56.  Moreover, Rivera's trial counsel subjected Negrón to lengthy cross-examination about his cooperation with the government and his other drug transactions.  Despite these efforts to impeach Negrón, the jury could have rationally concluded that Negrón was telling the truth about his sale of cocaine to Rivera.

Rivera also attempted to contradict this testimony by offering the testimony of his ex-wife, Malavé, that his residence was occupied by a tenant at the time of the alleged transaction. However, the jury could reasonably have found Negrón's testimony to be more credible than Malavé's. Malavé's recollection of the relevant dates was uncertain, especially on cross-examination, and Rivera's attorney even conceded in his closing argument that Malavé's testimony had been "all over the place."

Rivera further contends that, even if the jury found credible Negrón's uncorroborated testimony that Negrón sold cocaine to him, this single transaction cannot, as a matter of law, establish his guilt of the crime of conspiracy. We agree that a single drug transaction for the personal use of the purchaser, without prearrangement or other factors indicative of conspiratorial intent, does not establish a conspiracy. See United States v. Moran, 984 F.2d 1299, 1304 (1st Cir. 1993). Nonetheless, we have found, under certain circumstances, that one drug transaction may provide sufficient evidence for a jury to find the existence of a conspiracy to distribute cocaine. See, e.g., Portela, 167 F.3d at 698 ("The evidence . . . was thus sufficient to have led a reasonable jury to conclude that [the defendant] was a party to a tacit agreement relating to

[the seller's] entire continuing enterprise, despite the fact that there was only a single transaction between them."); <u>Moran</u>, 984 F.2d at 1303 ("Even a single sale for resale, embroidered with evidence suggesting a joint undertaking between buyer and seller, could suffice."); <u>United States</u> v. <u>Carbone</u>, 798 F.2d 21, 27 (1st Cir. 1986). Drawing on the body of conspiracy law we have just described, we evaluate the circumstances that support the conspiracy conviction.

### 2. Knowing participation in a conspiracy to possess with intent to distribute cocaine

Negrón admitted that he sold cocaine for profit, and he testified that he sold one kilogram of cocaine to Rivera. Such a large quantity of drugs supports the inference that Rivera did not intend to use the cocaine merely for personal consumption, but rather intended to acquire it for redistribution. <u>See</u> <u>United States</u> v. <u>Jesús-Ríos</u>, 990 F.2d 672, 680 (1st Cir. 1993); <u>United States</u> v. <u>Geer</u>, 923 F.2d 892, 895 (1st Cir. 1991) ("The jury could infer the fact of a conspiracy to distribute drugs from the quantities of cocaine and hashish involved - quantities far larger than needed for personal use."). The inference that Rivera's purchase was for resale is strengthened by Ramírez's testimony that Ramírez resold the one kilogram of cocaine he purchased from Negrón.

Rivera's cash payment of $13,500 to Negrón also supports an inference that Rivera was engaged in the business of buying and selling cocaine. Negrón testified that Rivera agreed to purchase the cocaine on the afternoon of April 15. Slightly more than twelve hours later, in the early morning of April 16, Rivera gave Negrón $13,500 in exchange for the drugs. The ability to gather such a large amount of cash overnight supports an inference that Rivera was more than a one-time, casual purchaser of cocaine. That inference draws further support from the promptness of Negrón's phone call to Rivera after coming into possession of the cocaine. Negrón did not make random calls. He called Ramírez, to whom he had sold drugs on several occasions, and Rivera, whom he knew. As the government said during its closing argument: "This is not a supermarket where you go and you select the product that you want. If you want drugs you have to know where to get them and who sells them because William Negrón Zapata would not sell you or any one of you any drugs unless he knew that you were in the same business he was."[5]

---

[5] Although Rivera claims on appeal that this was improper argument, inviting the jury to convict Rivera "merely as a result of knowing Negrón-Zapata," we find that this was a fair argument given the evidence presented.

Additionally, there was evidence that Rivera owned multiple properties in Puerto Rico. As the government argues, it is reasonable to question the source of this wealth, particularly because Rivera's automobile shop in his home was not likely to generate the quantity of cash Rivera had available to purchase cocaine from Negrón.[6] A reasonable jury could find, on these facts, that Rivera's income was supplemented by money he earned from buying cocaine and selling it for profit.

There is ample evidence, in short, that Rivera and Negrón shared the common objective of buying and selling cocaine for profit, agreed on a transaction for that purpose, and carried it out. See Portela, 167 F.3d at 695. This transaction was far different than the "unplanned spot sale with no agreement beyond that inherent in the sale" noted in Moran. Moran, 984 F.2d at 1302. "[W]here advanced plans are made regarding the sale of narcotics in wholesale quantities, the

---

[6] Rivera objects to the government's comment, in closing argument, about his ownership of these properties. Specifically, he contends that the following comments by the prosecutor were misleading and may have led the jury to convict him for an improper reason: "The defendant, you know from the evidence, is the owner of at least four structures . . . . And what is the occupation of the defendant? Mechanic body repair shop. How many people do you know who own a mechanic shop, auto body repair shop, you see them all over the island, that own four houses. . . . Look at that house. Big. Commercial antennas, solar system. The works. What a house. Two stories. We know that he owns a house. Good." There was no error in this closing argument, which was based on the evidence.

participants in the transaction may be presumed to know that they are part of a broader conspiracy." United States v. Harris, 8 F.3d 943, 946 (2d Cir. 1993) (quotation marks omitted).

With respect to that broader conspiracy, Ramírez testified that he and Negrón engaged in cocaine transactions on numerous occasions, and Negrón provided the details of his sale of cocaine to Rivera.  Negrón also testified that he had "participated in endless numbers of drug transactions with Mr. Amador [Irizarry]"[7] prior to 1991.  Negrón and Rivera had known each other since 1986 and met on several occasions in 1990. These contacts over a several year period provided an opportunity for Rivera to know of Negrón's involvement in other drug transactions, particularly because Negrón had a long history as a drug dealer.  Indeed, Negrón's familiarity with Rivera is demonstrated by the fact that Negrón chose not to bring his bodyguard with him when he delivered the cocaine to Rivera, although he did bring his bodyguard along when he received the two kilograms of cocaine from Padilla.  This routine quality of Rivera and Negrón's one kilogram transaction in April 1991 supports an inference of Rivera's awareness of Negrón's involvement with these other transactions.  This

---

[7] For unexplained reasons, the indictment did not allege that Irizarry was part of this conspiracy.

-15-

knowledge, coupled with Rivera's cash purchase of a large quantity of cocaine for resale, suffices to establish that Rivera was aware that his purchase was part of a larger conspiracy to distribute cocaine, and that he furthered the purpose of that conspiracy with his purchase. That Rivera did not fully understand the details of Negrón's many drug transactions is of no import. See Walters, 904 F.2d at 771 ("It is not necessary that the government prove that the defendant . . . knew the extent of the conspiracy."). Thus, a rational jury could have concluded that Rivera tacitly acquiesced in the scheme of Negrón and the other co-conspirators to distribute cocaine for profit when he purchased the kilogram from Negrón. Such a tacit understanding is sufficient for Rivera to be guilty of conspiracy. See Echeverri, 982 F.2d at 679.

Rivera relies on our decision in United States v. DeLutis, 722 F.2d 902 (1st Cir. 1983), to support his contention that a single act is insufficient to hold an individual criminally accountable for conspiracy. In DeLutis, however, there was no drug transaction, no evidence of an intent to sell the defendant a large quantity of cocaine, and only an inference that the defendant intended to buy an undetermined amount of cocaine. See 722 F.2d at 907. Still, we reaffirm the general proposition advanced in DeLutis that "a single sale of drugs

-16-

without more does not establish a conspiracy."  Id. at 906.
Here there was enough additional evidence to establish the
conspiracy charged and to withstand Rivera's sufficiency
challenge.

### III. Amendment to the Indictment

Rivera argues that he was prejudiced because the
government, prior to trial, amended the indictment to correct a
clerical error.  In the overt acts charged under Count VI, the
conspiracy charge, the government amended the language to
substitute "UCC No. 1" for "UCC No. 2," and vice versa, in every
paragraph except one.  In other words, the indictment wrongly
referred to Negrón, UCC No. 1, as UCC No. 2 in the description
of the overt acts, and similarly referred to Ramírez, UCC No. 2,
as UCC No. 1.  The correction simply required a substitution of
"No. 1" for "No. 2" and "No. 2" for "No. 1."  Rivera has not
explained how this correction failed to give him notice of the
conspiracy charge against him.  Moreover, the government was not
even required to prove any overt acts in furtherance of the
conspiracy.  See Portela, 167 F.3d at 702.  Thus, correcting
this clerical error did not deprive Rivera of notice of the
charge against him.

### IV. Variance

In a claim closely related to his claim about the amendment to the indictment, Rivera argues that his conviction should be vacated because there was a variance between the conduct alleged in the indictment and the proof offered at trial. "To be sufficient grounds for reversal, a variance must be severe enough to affect the defendant's substantial rights." Portela, 167 F.3d at 700. We review this question de novo. See id.

As we just explained, the government amended the indictment prior to trial to exchange the words "UCC No. 1" for "UCC No. 2" in the description of the overt acts, except for paragraph four of that description, which remained unchanged. The relevant portions of the corrected indictment, described as the overt acts in furtherance of the conspiracy, read as follows:

> 3. On or about April 15, 1991 at approximately 7:30 p.m., UCC No. 1 called Carlos Rivera-Ruiz to offer him one (1) kilogram of cocaine for the price of thirteen thousand five hundred dollars ($13,500.00). Rivera-Ruiz agreed and on the following date April 16, 1991 UCC No. 1 delivered to Rivera-Ruiz one (1) kilogram of cocaine located at Road 4406, Anones ward, Las Marías, Puerto Rico.
> 4. On or about April 16, 1991 at approximately 8:00 a.m., UCC No. 1 sold and delivered to Carlos Rivera-Ruiz one (1) kilogram of cocaine and was paid for thirteen thousand five hundred dollars ($13,500.00).

-18-

Rivera argues that paragraphs three and four of the amended indictment charge him with purchasing two kilograms of cocaine from Negrón, while the evidence presented at trial established only that he purchased one kilogram.

We reject this claim. Based on a reasonable reading of paragraphs three and four, we conclude that the purchase of one kilogram of cocaine on the morning of April 16 is simply described twice. The indictment does not allege two separate purchases. There was no variance. Moreover, as noted, the prosecution was not required to prove overt acts in order to establish Rivera's guilt on the conspiracy charge. See Portela, 167 F.3d at 702. Thus, even if we were to adopt Rivera's strained reading of paragraphs three and four, that reading would not warrant reversal of his conviction because such an error in the recitation of the overt acts did not affect his substantial rights.

## V. Closing Arguments

Rivera contends that the prosecutor deprived him of due process of law by making several improper remarks during his closing argument. Specifically, he identifies four comments that he claims could have led the jury to convict him on an improper basis. Because Rivera did not object to these comments

at trial, we review his claim for plain error.  See Fed. R.
Crim. P. 52(b); see also United States v. Olano, 507 U.S. 725,
731 (1993); United States v. Baldyga, 233 F.3d 674, 681 (1st
Cir. 2000).  To correct the alleged error, "we must conclude
that there was error, that the error was plain, and that it
affected the substantial rights of the defendant."  Baldyga, 233
F.3d at 681.  We may find that the allegedly improper remarks
affected Rivera's substantial rights only if we conclude that
the prosecutor's comments affected the outcome of Rivera's
trial.  See id. at 682.

        As we noted in our discussion of the sufficiency of the
evidence, Rivera objects to one comment about his ownership of
multiple properties and to another comment where the prosecutor
argued that Negrón would not have called Rivera if the two men
were not in the same business ("the supermarket comment").  We
have already ruled that there was nothing improper about these
remarks.  Although Rivera quotes the other two challenged
remarks at length in his brief, we need not discuss these
passages separately because we are convinced that the
prosecutor's closing argument did not affect the outcome of
Rivera's trial, and hence there was no plain error in the
remarks.

### VI. Sentencing

-20-

Finally, Rivera appeals the sentence of 121 months imposed by the district court, arguing that the court erroneously based this sentence on the understanding that Rivera purchased two kilograms of cocaine, rather than only one. We review this claim for plain error because Rivera did not object at the time of sentencing. See United States v. Torres-Rosa, 209 F.3d 4, 8 (1st Cir. 2000). Because we find that Rivera faced a mandatory minimum sentence of ten years regardless of the amount of cocaine for which he was held accountable, see 21 U.S.C. § 841(b)(1)(B),[8] we conclude that there was no plain error.

More than one year prior to trial, the government filed an information pursuant to 21 U.S.C. § 851[9] to establish that Rivera had a prior conviction for importing cocaine into Puerto Rico. The document served to notify Rivera that the prosecution intended to seek an increased sentence pursuant to 21 U.S.C. § 841(b)(1)(B) because of this prior conviction. Thus, as

---

[8] Section 841(b)(1)(B) provides: "If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 10 years."

[9] Section 851 provides, in pertinent part: "No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial . . . the United States attorney files an information with the court . . . stating in writing the previous convictions to be relied upon."

Rivera concedes in his brief to this court, he faced a mandatory minimum sentence of ten years regardless of the amount of cocaine attributed to him by the sentencing court. Accordingly, his challenge to the amount of cocaine attributed to him is irrelevant to his sentence. See, e.g., United States v. Tavano, 12 F.3d 301, 307 (1st Cir. 1993) ("It is unnecessary to address a dispute over drug quantity if, and to the extent that, adjudicating it will not . . . bring a different mandatory minimum sentence into play.").

**Judgment and Sentence Affirmed.**