# United States Court of Appeals
## For the First Circuit

No. 08-1855

UNITED STATES OF AMERICA,

Appellee,

v.

DARRYL DOWDELL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Torruella, Selya and Howard,
Circuit Judges.

Charles W. Rankin, with whom Michelle Menken and Rankin & Sultan, were on brief, for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom Michael K. Loucks, Acting United States Attorney, was on brief, for appellee.

February 12, 2010

**HOWARD**, <u>Circuit Judge</u>.  Following a three-day jury trial, Defendant Darryl Dowdell was convicted of distribution of cocaine base and sentenced as a career offender to 198 months' imprisonment.  Dowdell appeals the conviction, alleging three defects:  that the delay between his indictment by state authorities and his ultimate trial in federal court violated his Sixth Amendment speedy trial rights as well as the Interstate Agreement on Detainers; that the district court's amendment of the indictment from "cocaine" to "cocaine base" violated the presentment clause of the Fifth Amendment; and that the trial court abused its discretion on various evidentiary rulings.  He also challenges the sentence imposed, arguing that the government's recommended sentence of 262 months violated a promise not to seek a term of imprisonment longer than 20 years.  For the reasons that follow, we affirm both the conviction and the sentence.

## I. Background and Travel

While the facts surrounding the underlying offense are not complicated, the pre-trial procedural history of this case presents a maze of overlapping federal and state activity, a flurry of continuances, and a revolving door of withdrawn and newly appointed defense counsel.

### A. The Subject Offense

The following facts were elicited at Dowdell's federal trial.

In the summer of 2001, several Massachusetts authorities launched a coordinated effort with the federal Drug Enforcement Administration (DEA) to investigate drug trafficking in the area of a housing project in Roxbury. The investigation involved a task force of undercover officers who made controlled purchases of cocaine and crack cocaine from dealers operating in the project. One of these officers was Boston Housing Authority investigator Joao Monteiro. Posing as a construction worker, Monteiro drove an unmarked car with a concealed audio transmitter and a video camera that focused on the automobile's interior passenger compartment.

On July 6, 2001, Monteiro observed Dowdell standing on the sidewalk with a man named Robert White, whom Monteiro recognized from previous encounters. Dowdell was wearing dark pants and a black shirt. He and White were counting cash. Monteiro signaled to White that he wished to purchase crack cocaine, and White went to talk to Dowdell. White then approached Monteiro's car and got into the passenger seat. White told Monteiro that Dowdell, at this point identified only as "the dark-skinned brother" in the dark shirt, was a trustworthy dealer. After purchasing 1.1 grams of crack cocaine for $230, Monteiro asked White whether "the dude in black" was the person to see for future purchases if White were unavailable. White replied affirmatively and informed Monteiro that Dowdell went by the name

"Smoke." Monteiro departed, after informing White that he would be returning in a short while to make another purchase.

Some 45 minutes later, Monteiro returned to the project and saw Dowdell on a bicycle. Monteiro approached Dowdell, who asked Monteiro if he wanted anything. Monteiro responded that he was looking for White, and Dowdell then biked over to the spot where White was standing. White came over to Monteiro's car and, for the second time that night, sat down beside Monteiro in the passenger seat. Monteiro told White that he wished to purchase more drugs, as well as baggies for repackaging. White agreed and, after directing Monteiro to a parking area close to the spot of the first transaction, sold him 1.2 grams of crack cocaine and baggies for $210.

Monteiro returned for a third buy on July 16, ten days after the first two. When he arrived, he saw Dowdell standing in a small group, wearing blue jeans and a blue checkered shirt. Monteiro again asked for White, who was unavailable. Monteiro asked for directions and drove away, making it appear that he was going off to search for White. After waiting long enough to give the impression that the search was unsuccessful, he returned to the project looking for Dowdell. He found Dowdell on the sidewalk, still wearing a blue checkered shirt. Monteiro called out "Yo, Smoke, can I holler at you." Dowdell approached Monteiro's car, and the two of them proceeded to have a conversation through the

passenger-side window.  Continuing to address Dowdell as "Smoke," Monteiro asked for about $200 worth of crack cocaine.  Dowdell left briefly to meet with another individual and then returned with six bags of crack cocaine, worth approximately $100.  Seven more bags would eventually follow.  The total weight of the thirteen bags was approximately 2.3 grams.  During this whole encounter, Dowdell was only partially visible on the video that Monteiro's surveillance camera recorded.

Driving away, Monteiro narrated a description of Dowdell for the surveillance recording.  He stated, "Smoke is the same kid as the last time.. [sic] he's got on a checkered shirt blue...blue checkered shirt umm and he was riding a bicycle."

Later that day, Dowdell was arrested on an outstanding warrant unrelated to his transactions with Monteiro.  He was brought to a Boston police station where a booking photo was taken. In the photo, Dowdell was wearing a blue checkered shirt, as Monteiro had described earlier in the day.  Later, around four hours after completing the buy from Dowdell, Monteiro was shown the photograph and identified the depicted individual as "Smoke." Monteiro reported that the individual in the photograph was the same person from whom he had purchased drugs that day and whom he had seen standing on the corner with White ten days beforehand.

## B. Pre-Trial Procedural History

Because the timing of particular pre-trial events is important to our legal analysis, we must delve into some detail in retracing the path on which this case traveled before it reached the jury.

On March 25, 2002, eight months after the July 2001 encounters at the housing project, a Suffolk County grand jury indicted Dowdell, based on those events, for distributing a controlled substance in the vicinity of school property. At his arraignment, he pled not guilty and was released on bail, which was subsequently revoked in October 2003 due to a charge on an unrelated crime. On April 12, 2004, Dowdell's appointed counsel withdrew his representation and was replaced. That replacement would in turn withdraw in August of that year, and the court appointed a third attorney.

On November 17, 2004, the federal government filed a criminal complaint against Dowdell based on the July 2001 events, charging him with distribution of crack cocaine in violation of 21 U.S.C. § 841(a)(1). At that time, Dowdell was already serving a 27-month sentence in the Suffolk County House of Correction after a conviction on the unrelated charge that had triggered his bail revocation. One month later, in December 2004, the Commonwealth entered a nolle prosequi on the March 25, 2002 indictment for distributing a controlled substance in the vicinity of school

property, effectively terminating its prosecution. Dowdell remained in state custody as he continued to serve his ongoing sentence on the unrelated charge, but from this point onward he faced only the federal distribution charge.

On February 4, 2005, then unrepresented by counsel, Dowdell wrote a letter to a clerk for the magistrate judge overseeing the pre-trial proceedings in his federal case. The letter invoked his speedy trial rights under 18 U.S.C. § 3161. Nearly three weeks later, Dowdell followed this letter with a formal request under the Interstate Agreement on Detainers (IAD), 18 U.S.C. App. 2, § 2, that he be transferred from state to federal custody as he awaited the resolution of the federal charge. On March 14, 2005, the federal government petitioned for a writ of habeas corpus ad prosequendum, and on March 22, 2005, Dowdell was brought into federal district court for his initial appearance, at which point he was assigned new representation.

During the initial appearance, the prosecutor acknowledged that Dowdell's transfer into federal custody was pursuant to a writ "based on the defendant's request under the interstate agreement on detainers." He proceeded to explain that Dowdell had no intention of waiving his IAD rights, which Dowdell's counsel confirmed. By preserving his rights under the IAD, Dowdell was to remain in federal custody and receive credit toward the fulfillment of his term of incarceration for the unrelated charge

in the state-court system, but receive no credit toward any eventual federal sentence for the distribution offense until the state-court sentence had fully elapsed.

The next day, March 23, a federal grand jury indicted Dowdell, charging him with one count of "knowingly and intentionally possess[ing] with intent to distribute and distribut[ing] a quantity of cocaine" in violation of § 841(a)(1). Dowdell was arraigned on this charge on March 29, 2005. As in the state court proceedings, he entered a plea of not guilty. The court held an initial status conference on May 11, 2005, during which it set a deadline of June 23 for all dispositive motions. At Dowdell's request, that deadline was later extended to July 8.

Dowdell filed a motion to dismiss the indictment at the new July 8 deadline, claiming a violation of the Speedy Trial Act, 18 U.S.C. § 3161, as well as violation of the Sixth Amendment.[1] Specifically, Dowdell posited that prejudice had resulted from the pre-indictment delay in federal court.[2] In an unsworn declaration, Dowdell contended that the Commonwealth had vindictively choreographed the delay and the eventual transfer to federal jurisdiction in retribution for his declining to testify before a

_____

[1]The Speedy Trial Act claim is not before us on appeal.

[2]The constitutional provision that applies to pre-indictment delay is, in fact, the Fifth, rather than the Sixth, Amendment. See United States v. Marler, 756 F.2d 206, 209-10 (1st Cir. 1985). Dowdell's counsel appears to have corrected this point in a supplemental filing.

-8-

state grand jury in a shooting case in which he had apparently been the victim. The declaration claimed that the district attorney was upset at Dowdell's alleged inability to see the face of the shooter and had stated "if you blow my case I am gonna get your drug case sent back to the feds." This alleged state-federal collusion, Dowdell argued, meant that the starting point for measuring any speedy trial violations ought to be the date of his state indictment, that is, March 25, 2002, rather than the federal indictment on March 23, 2005.

The docket then lay dormant for four months. Although the government was required by rule to file its opposition to the motion to dismiss within two weeks, see D. Mass. R. 7.1(b)(2), it was not until November 7, 2005 that the government sought leave to file a late opposition. Apparently, the government had actually prepared the memorandum of law in July and assumed that it had been timely submitted. The motion for leave to file explained the delay as a simple error in performing the electronic submission. The district court granted this request, finding no evidence of bad faith on the part of the government. The next day, the government filed its opposition.

On December 17, 2005, before the court had taken any action on the pending motion to dismiss, Dowdell moved to withdraw his appointed counsel -- as he had done twice before in state court -- claiming a breakdown in communication. The court held an ex

parte hearing on February 14, 2006. It explained to Dowdell that appointing new counsel would further delay his case. Dowdell expressed that he would ideally like to resolve the case as soon as possible with his current counsel, but "we seem to not be seeing eye to eye with each other, so I thought I had no choice but to do that. . . . I don't want to put it off anymore. I've told him that. But I just felt that my life is on the line here, and I just felt that I need a new attorney." The court granted Dowdell's request and allowed his attorney to withdraw. Dowdell and the government agreed that any time that elapsed between the withdrawal and an eventual ruling on the motion to dismiss would be excluded from the speedy trial calculation.

On March 2, 2006, the court appointed new counsel, Victoria Bonilla. On June 16, 2006, after Bonilla had time to acquaint herself with the case, Dowdell moved to supplement the motion to dismiss. The court held a non-evidentiary hearing on the matter and, after setting a trial date of July 31, 2006, granted the motion to supplement. On June 30, Dowdell filed the supplemental memorandum, alleging, <u>inter alia</u>, infringement of Dowdell's due process rights.[3] Neither the original motion nor the supplemental memorandum mentioned the IAD.

The government filed its response on July 11, 2006. The response erroneously asserted that Dowdell had in fact waived his

---

[3]The due process claim is not before us on appeal.

IAD rights at his initial appearance, "rendering it inapplicable for purposes of the motion to dismiss." Regardless, the government claimed, no IAD violation had occurred.

The court held a hearing on the motion on July 14, 2006. Bonilla, who had not been involved in the case when Dowdell first appeared, did not mention the IAD or contest the alleged waiver. As indicated in the following colloquy between Bonilla and the court, Dowdell's sole grounds for dismissal concerned the period prior to the federal indictment, rather than any post-indictment developments:

> THE COURT: Okay. All right. Now, turning more directly to your motion, the supplemental motion for -- to dismiss, do I understand, Ms. Bonilla, that the defendant is not contesting the time between the indictment, the federal indictment, in March of 2005, and today's date but that what you are concentrating on is the time between the November or December notice, December of 2004, and the indictment in March of 2005, as exceeding 30 days in violation of the statute? Is that --
>
> MS. BONILLA: That's fair to say, your Honor.
>
> THE COURT: That's fair to say. So we're not concerned with anything that happened between March and the -- March of 2005 and the filing of the original motion to dismiss in July of 2005, and the snafu of the government in not responding to that motion until November of 2005, is that correct?
>
> MS. BONILLA: Yes, your Honor. My motion focuses on what happens before.

The court ultimately denied the motion in its entirety, including Dowdell's constitutional speedy trial argument, and prepared to

move onward to the July 31 trial date.  Dowdell, however, once again requested a continuance, this time because of the possibility that a prior state conviction might be expunged from his record in the interim (an occurrence that could affect plea negotiations).  Michael Bourbeau, one of Bonilla's partners who was also representing Dowdell at the hearing, explained that "we've talked about Mr. Dowdell's Speedy Trial rights.  But the ramifications of this, I think, this prior [state conviction] -- the determination that can be made on that prior is, I think, very significant as to whether this case needs to go forward to trial."  The government agreed with this representation.  At that point, the court took pains to ensure that Dowdell understood the ramifications of any postponement:

> THE COURT: The Court's schedule is such that it couldn't be for probably three months.
>
> MR. BOURBEAU: We understand the Court's concern.  We've had discussion with Mr. Dowdell.
>
> THE COURT: Yeah, I mean, this is the oldest case, I think, on my docket, maybe not in the docket number but with respect to the date of the alleged crime.  It needs to be resolved.  Your request, of course, is made on behalf of the defendant now who needs to have his rights --
>
> MR. BOURBEAU: Yes.
>
> THE COURT: -- pursued and resolved.
>
> ...

THE COURT: All right. The Court will allow the defendant's motion to continue the trial until September 18th on the extraordinary circumstance that we all find ourselves in this case. It is something that is very much of concern to the Court that this matter be resolved sooner rather than later, but I understand the import of what Mr. Bourbeau is suggesting and that it may well inure to the benefit of not only counsel but of the Court in terms of judicial economy or economy of the Court's expenditure of time. So I'm going to allow that motion for continuance.

Thus, at Dowdell's own behest, the trial was pushed back an additional month and a half.

The September 18th trial date met the same fate as the preceding July 31st date -- postponement. For the second time since his federal indictment, and for the fourth time overall, Dowdell's attorney moved to withdraw representation. In a motion dated August 8, 2006, Bonilla informed the court that Dowdell believed there to have been an irreparable breakdown in communications. The court held an ex parte hearing on August 16, 2006, after which it denied the motion. But on September 8, Dowdell sent the court a pro se, handwritten motion to reconsider its denial. On September 18, 2006, the court held another ex parte hearing, after which it determined that the best course was indeed to allow Bonilla to withdraw. The trial date was once again pushed back to December 11, 2006, and a new attorney, Mark Shea, was appointed on October 31, 2006.

-13-

As with his predecessors, Shea's tenure as Dowdell's counsel would terminate prematurely, though this time not at Dowdell's request. On November 28, 2006, Shea informed the court that he had a conflict of interest that compelled withdrawal. The court allowed another change in representation. The trial date was rescheduled for February 27, 2007.

Dowdell's new attorney (now his fourth since the federal indictment and seventh overall) was granted a requested continuance on December 18, 2006 in order to acquaint himself better with the case. Trial was set for April 9, 2007. On March 15, 2007, Dowdell's attorney once again requested a continuance, this time both in order to ensure effective assistance and because of a personal conflict. The court granted this final continuance. The trial commenced on May 29, 2007 -- nearly six years from the date of the offense.

### C. Modifying the Indictment

We briefly depart from our chronological march through the events and take several steps back to August 2006, when the trial was still scheduled for the following month. On August 30, the government filed a motion to advise the court of a potential variance between the text of the indictment and the proof to be adduced at trial. The indictment did not refer to "cocaine base" or "crack cocaine," as had the federal complaint and accompanying affidavit, the petition for habeas corpus ad prosequendum, the

-14-

testimony before the grand jury, the magistrate judge's colloquy with Dowdell at his initial appearance, and various discovery documents that Dowdell had previously been provided. Instead, it simply read "cocaine," potentially suggesting the powder form of the substance. Arguing that modifying the text from "cocaine" to "cocaine base" would not constitute a material change requiring a superseding indictment, the government asked the court to declare the original indictment suitable for trial. The government professed an inability to explain why the indictment did not specifically allege distribution of cocaine base, but sought to clarify the matter prior to trial and avoid unnecessary jury confusion over the controlled substance allegedly distributed.

Recognizing that a variance, by definition, can only be determined after the presentation of evidence, the court chose to treat the government's pre-trial motion as one to amend the indictment.[4] It then analyzed whether the proposed correction would rise to the level of a constitutional violation. The court granted the government's motion, reasoning that Dowdell had been well apprised all along of the fact that he was charged with

---

[4]We have explained the difference between a variance and an amendment as follows: "A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them. A variance occurs when the charging terms remain unchanged but when the facts proved at trial are different from those alleged in the indictment." United States v. Fisher, 3 F.3d 456, 462-63 (1st Cir. 1993) (citations and internal quotation marks omitted); see also Gaither v. United States, 413 F.2d 1061, 1071 (D.C. Cir. 1969) (offering similar distinction).

distribution of cocaine base and not cocaine powder.  It further noted that the particular drug type alleged (whether cocaine base or cocaine powder) was not actually an element under § 841(a)(1) and did not have any effect on the evidence the government intended to proffer at trial.  Therefore, the court concluded, the amendment was akin to a permissible typographical correction.  See United States v. Dowdell, 464 F. Supp. 2d 64, 68 (D. Mass. 2006).

## D. Evidence Presented at Trial

At trial, Dowdell's primary argument was misidentification.  He claimed that he was not the "Smoke" referred to in surveillance recordings and that the video footage was inconclusive as to whether a man with a blue checkered shirt was actually involved.  In order to corroborate Monteiro's identification of Dowdell as Smoke, the government introduced, inter alia, two items that Dowdell had unsuccessfully attempted to exclude through pre-trial motions in limine: the booking sheet from the July 16 arrest and several of White's July 6 statements captured on videotape.

## 1. The Booking Sheet

The booking sheet contained both the photograph of Dowdell in the blue checkered shirt on which Monteiro had based his identification, as well as a textual description of Dowdell's clothing as including a "blue plaid shirt."  Dowdell argued that the document was inadmissible because a provision of Federal Rule

of Evidence 803(8), the so-called "law-enforcement exception," forbids the introduction of police reports against criminal defendants. The government countered that a booking sheet should not run afoul of the exception because it contained merely "rote, routine administrative information." The district court concluded that the document was admissible pursuant to both

> Fed.R.Evid. 801(d)(1) (because the document formed the basis of a witness's identification) and Fed.R.Evid. 803(8) (because the document reflects routine procedures based upon information from the defendant himself and not observations, conclusions or opinions of police officers which are normally contained in police reports). In sum, the document possesses the requisite indicia of trustworthiness to be admissible under more than one of the Federal Rules of Evidence.

At trial, the government proffered an edited version of the booking sheet. All information relating to the charges against Dowdell was redacted, while the sections describing clothing and appearance remained. In addition, the government introduced the photograph separately, unaccompanied by the booking sheet. It was on the basis of this photograph, rather than the booking sheet, that Monteiro would testify he had made his identification of Dowdell as Smoke.

2. Video Evidence

Dowdell had also objected in limine to the introduction of White's videotaped statements from the two transactions on July 6, 2001. There were two tapes at issue, one from each transaction.

The first showed White telling Monteiro who "Smoke" was and confirming that he was reliable. The second showed Monteiro approaching Dowdell and asking him to summon White, which Dowdell then did.

Dowdell challenged the admissibility of the statements on two distinct grounds. First, he argued that the statements constituted proof of prior bad acts that would be barred by Rule 404(b). The government responded that the statements were not offered as prior bad acts so much as intrinsic evidence of the specific crime alleged. It posited that the jury would not be able to understand fully the July 16th transaction without knowing what had occurred on July 6th. Dowdell's second argument was that there was insufficient evidence to treat White as a co-conspirator under Rule 802(d)(2)(E), and hence White's statements should be deemed inadmissible hearsay. The government not only contested Dowdell's insufficiency claim, but also argued that the statements would be independently admissible as relating to the basis for Monteiro's identification. Under this alternative theory, White's statements could at least be introduced for the impact that they had on Monteiro and his subsequent identification of Dowdell as "Smoke," if not for the truth of the matter asserted.

The district court rejected both of Dowdell's objections during the final pre-trial conference. With respect to the Rule 404(b) claim, it found that "the transaction with Robert White is

directly and instrinsically relevant to the charge against Mr. Dowdell in this case." As for the hearsay claim, the district court adopted both of the government's theories of admissibility.

During the course of the pre-trial conference, Dowdell argued that even if a transcript of the statements would be admissible, the videotape itself would be unfairly prejudicial. The government insisted that it was entitled to use the video to prove its case, as only the video showed what sort of opportunity Monteiro had to actually see Dowdell from the car. Again, the district court rejected Dowdell's argument, finding that the videotape was the best evidence. Though ordering two minor edits to the video and the corresponding transcript,[5] the court ruled that the videotaped statements were otherwise admissible in their original form.

### E. Sentencing

On May 31, 2007, after three days of trial, the jury returned a guilty verdict.

Under § 841(b)(1)(c), Dowdell would normally have faced a maximum sentence of 20 years. Mention of this 20-year maximum had arisen earlier in the pre-trial proceedings, when Dowdell had challenged the government's attempt to amend the indictment. Dowdell had initially claimed that the change in drug type was

---

[5]The two edits were (1) changing the Defendant's name in the transcript from "Dowdell" to "Smoke" and (2) deleting a statement by White that Dowdell was his "cousin."

material because it might increase the sentence length to which he would be exposed. The government had responded that because drug type was not an element in this case, the maximum would remain at 20 years regardless. In making this point, the government had stated in writing that it was "not seeking (and cannot seek) a sentence in excess of 20 years." The district court cited this language in allowing the amendment.

Nevertheless, in April 2007, the government filed an information to establish a prior conviction under 21 U.S.C. § 851, which increased the statutory maximum from 20 to 30 years (and the guideline range from 210-262 months to 262-327 months). At sentencing, the government recommended a 262-month sentence, at the bottom end of the guideline range but well over the original 20-year statutory maximum. The court ultimately sentenced Dowdell to 198 months, followed by six years' supervised release. Dowdell did not object to the sentence.

## II. Discussion

### A. Speedy Trial Rights

Dowdell first contends that the district court erred in denying his motion to dismiss on constitutional speedy trial grounds. The district court noted, but never resolved, whether the appropriate starting point for the speedy trial clock was the federal or the state indictment. Because it determined that "Dowdell ha[d] failed to demonstrate prejudice which rises to the

level of a constitutional violation," the court did not reach the issue of the precise length of the delay. We review the speedy trial ruling for abuse of discretion. United States v. Munoz-Franco, 487 F.3d 25, 58 (1st Cir. 2007).

The Sixth Amendment provides that all criminal defendants "shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. If the government violates this constitutional right, the criminal charges must be dismissed. Strunk v. United States, 412 U.S. 434, 439-40 (1973). To determine whether a violation has occurred, we use the four-part balancing test established in Barker v. Wingo, 407 U.S. 514 (1972), which requires a weighing of: (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant resulting from the delay. Id. at 530.

The threshold inquiry concerns the first of these four, as the sheer brevity of pre-trial delay may obviate the need for further analysis. See id. ("Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."). Should there be a lengthier delay, however, we must engage in the "difficult and sensitive balancing process" of placing each of the other factors on the scale. Id. at 533. Thus, "the length of the delay is both the trigger for analysis and one of the factors to be considered." United States v. Colombo, 852 F.2d 19, 24 (1st Cir. 1988); see also

-21-

Doggett v. United States, 505 U.S. 647, 651 (1992) (referring to the length-of-delay factor as a "double enquiry"). Once it is determined that balancing is necessary, none of the four factors has any talismanic power. Rather, "we must still weigh all of the factors collectively before deciding whether a defendant's right to a speedy trial has been violated." Colombo, 852 F.2d at 23.

It is not clear to us whether the district court may have glossed over this multi-part analysis by disposing of the issue on the question of prejudice alone. In any event, a violation of the Speedy Trial Clause may occur even absent any affirmative demonstration of prejudice to the accused. Moore v. Arizona, 414 U.S. 25, 26 (1973) (per curiam) (holding that because Barker "expressly rejected the notion that an affirmative demonstration of prejudice was necessary to prove a denial of the constitutional right to a speedy trial," the state court was "in fundamental error" for requiring a showing of prejudice to the defense at trial). If indeed a lengthy delay is present, a single factor in isolation cannot dispose of an issue as "amorphous, slippery, and necessarily relative" as the right to a speedy trial. Vermont v. Brillon, 129 S. Ct. 1283, 1290 (2009) (internal quotation marks omitted).[6]

---

[6]Disposition of a constitutional speedy trial claim on prejudice alone is thus an error of law that itself constitutes an abuse of discretion. Nevertheless, even if such an error occurred here, it was harmless.

Our analysis will instead begin, as the King admonished the White Rabbit, at the beginning: the length of the delay. There is no bright-line time limit dividing the lengths that trigger further Barker inquiry from those that do not. Whether a particular delay will warrant further speedy trial scrutiny "is necessarily dependent upon the peculiar circumstances of the case." Barker, 407 U.S. at 530-31. Nevertheless, the Supreme Court has observed that "[d]epending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." Doggett, 505 U.S. at 652 n.1. Our cases comport with this observation. See, e.g., United States v. Munoz-Amado, 182 F.3d 57, 61 (1st Cir. 1999) (nineteen months); United States v. Santiago-Becerril, 130 F.3d 11, 21 (1st Cir. 1997) (fifteen months).

The difficulty in this case is determining just when the speedy trial clock ought to start running. The Sixth Amendment right to a speedy trial attaches upon formal accusation. United States v. MacDonald, 456 U.S. 1, 6-7 (1982). In the typical case, this means either arrest or indictment, whichever comes first. United States v. Casas, 425 F.3d 23, 33 (1st Cir. 2005). For Dowdell, who did not face any pre-indictment detention on his federal charge, the starting point would ordinarily be the date of his federal indictment, March 23, 2005. Dowdell, however, does not

challenge any length of time that elapsed after this date.[7] Instead, he focuses on the time frame preceding it, arguing that his speedy trial rights in fact accrued with his state indictment on March 25, 2002. Were that the case, it would yield a presumptively prejudicial delay of nearly three years before the federal indictment was returned.

Addressing this argument requires us to consider the speedy trial implications of the dual sovereignty doctrine. Under this doctrine, "the federal government is not bound by the actions of state authorities and . . . successive state and federal prosecutions are constitutionally permissible." United States v. Mejias, 552 F.2d 435, 441-42 (2d Cir. 1977). Though perhaps most recognizable from the double jeopardy context, see, e.g., Abbate v. United States, 359 U.S. 187 (1959), dual sovereignty considerations animate our constitutional speedy trial jurisprudence, as well. In MacDonald, the Supreme Court briefly noted that "an arrest or indictment by one sovereign would not cause the speedy trial guarantees to become engaged as to possible subsequent indictments by another sovereign." 456 U.S. at 10 n.11. Following MacDonald's lead, we observed in United States v. Marler, 756 F.2d 206 (1st Cir. 1985), that "a ruling that a defendant's right to a speedy

---

[7]He would, of course, have been entirely free to do so, as his speedy trial rights remained in effect up until his trial date, United States v. Jenkins-Watts, 574 F.3d 950, 966 (8th Cir. 2009), which was not until May 2007. Nevertheless, because Dowdell waived the claim with respect to this period, we do not address it.

-24-

federal trial attaches upon his state indictment would implicate the very concerns that led the Court to formulate the dual sovereignty doctrine in the double jeopardy area." Id. at 211. We further elaborated the policy arguments that bolster the case for a robust dual sovereignty doctrine in the speedy trial context:

> Were we to hold that Marler's state court indictment triggered his speedy trial right, we would in effect be requiring the federal government to keep continually abreast of all state criminal investigations that may present the possibility of federal prosecution and to pursue their own investigations, arrests, indictments, and trials so as to conform with state-dictated timing. This is obviously counter to the dual sovereignty doctrine as well as to effective, responsible law enforcement. . . . Thus, whatever the weaknesses in our dual system of justice, these could only be exacerbated by the proposed expansion of the sixth amendment speedy trial right.

Id.

Dowdell does not contest the truth of any of this as a general matter, but he nevertheless insists that his case falls within a recognized exception. He principally relies on United States v. Cabral, 475 F.2d 715 (1st Cir. 1973). In Cabral, state police officers investigating the defendant for sale of stolen property arrested him for possessing a sawed-off shotgun. The state turned the weapon over to federal authorities three days after the arrest. Cabral was indicted in state court for the stolen property offense and then, fifteen months later, in federal court for the weapons offense. In considering Cabral's speedy

-25-

trial claim, we held that his constitutional right "crystallized at the time of his initial [state] arrest" because it was for the same offense as his ultimate federal indictment, and "[t]he [federal] government's prosecution of this charge was initiated only three days later when . . . state authorities turned over this weapon to a federal officer." Id. at 718. Thus, Dowdell argues, Cabral instructs us to attribute a state-court indictment to the federal government where a subsequent federal indictment was essentially a continuation of the state proceedings. Because his state charges arose out of a federal investigation, were for the same offense as his federal charges, and were allegedly dismissed following a coordinated effort with the federal government, Dowdell would have us apply this Cabral exception in our speedy trial analysis here.

Cabral, however, predates the Supreme Court's development of the dual sovereignty doctrine in MacDonald. For this reason, the Marler court questioned, although it did not decide, whether Cabral remained good law. 756 F.2d at 212. Other courts have not been so hesitant. See, e.g., United States v. Garner, 32 F.3d 1305, 1309 (8th Cir. 1994) (rejecting Cabral's rationale and finding it "in conflict with subsequent statements made by the Supreme Court"); United States v. Collamore, 751 F. Supp. 1012, 1025 n.13 (D. Me. 1990) (recognizing that Marler had left the Cabral exception "an open question" and then definitively holding that "there is no such exception"). Dowdell labors to convince us

of <u>Cabral</u>'s continued vitality, pointing to some courts' careful efforts to distinguish it on the facts rather than reject it outright. But if <u>Cabral</u> has managed to survive until this point, it has only been through the force of its own obsolescence. Dowdell has not identified a single post-<u>MacDonald</u> case from this or any other jurisdiction to have relied on the exception he urges us to rely on here.

A quarter-century of consistent authority impels us to answer <u>Marler</u>'s question and hold that Supreme Court precedent has abrogated <u>Cabral</u>.[8] The speed of a federal trial is measured from the federal accusation on which it is based; one sovereign's enforcement of its own criminal laws is not attributable to another sovereign merely because of the presence of investigatory assistance, prosecutorial collaboration, or overlap among charges.

In his reply brief, Dowdell relatedly argues that this case falls within an exception to the dual sovereignty doctrine, established in <u>Bartkus</u> v. <u>Illinois</u>, 359 U.S. 121, 123-24 (1959), for situations in which the state prosecution is "merely a tool of the federal authorities." Dowdell has waived this argument by

---

[8]Following the procedure described in cases such as <u>Crowe</u> v. <u>Bolduc</u>, 365 F.3d 86, 89 n.1 (1st Cir. 2004) and <u>Carpenters Local Union No. 26</u> v. <u>U.S. Fid. & Guar. Co.</u>, 215 F.3d 136, 138 n.1 (1st Cir. 2000), the proposed panel opinion in this case was circulated to all active judges of the court, a majority of whom posed no objection to our handling of <u>Cabral</u>. The use of this informal procedure does not convert this opinion into an opinion en banc, nor does it preclude a suggestion of rehearing en banc on any issue in the case, whether or not related to the panel's treatment of <u>Cabral</u>.

neglecting to include it in his initial brief.  See United States

v. Hall, 557 F.3d 15, 20 n.3 (1st Cir. 2009).  Moreover, the

argument lacks merit.  The Bartkus exception is "narrow[ly]. . . .

limited to situations in which one sovereign so thoroughly

dominates or manipulates the prosecutorial machinery of another

that the latter retains little or no volition in its own

proceedings."  United States v. Guzman, 85 F.3d 823, 827 (1st Cir.

1996).  To establish a prima facie case, Dowdell would need to show

that "one sovereign was a pawn of the other, with the result that

notion of two supposedly independent prosecutions is merely a

sham."  Id.  He has not done so.  That the DEA was heavily involved

in Dowdell's investigation establishes little more than routine

intergovernmental assistance.  "Cooperative law enforcement efforts

between independent sovereigns are commendable, and, without more,

such efforts will not furnish a legally adequate basis for invoking

the Bartkus exception to the dual sovereign rule."  Id. at 828.

Dowdell's putative smoking gun, that an assistant district attorney

exclaimed "if you blow my case I am gonna get your drug case sent

back to the feds," shows, at worst, a threat.  It does not

establish coordinated manipulation, much less that the federal

government was acting as a pawn of Suffolk County officials such

that it retained little or no volition in its own proceedings.

We discern no evidence of improper collusion.  Although

the Bartkus exception may apply to some speedy trial cases, this is

not one of them.  Consequently, we conclude that Dowdell's speedy trial right attached on the date of his federal indictment.  There was no presumptively prejudicial delay, and analysis of the other Barker factors is therefore unnecessary.

## B. Interstate Agreement on Detainers

Even if the pre-trial delay does not offend the Sixth Amendment, it may still violate the IAD, 18 U.S.C. App. 2, § 2. The IAD is a congressionally sanctioned interstate compact designed to "encourage the expeditious and orderly disposition of [outstanding] charges and determination of the proper status of any and all detainers based on untried indictments, informations, and complaints."  Id. art. I.  To meet this goal, the IAD prescribes procedures by which a member state may obtain for trial a prisoner incarcerated in another member jurisdiction, and by which the prisoner may demand the speedy disposition of certain charges pending against him in another jurisdiction.[9]  See United States v. Mauro, 436 U.S. 340, 343-44, 349-53 (1978) (providing background on the IAD).  The IAD's provisions come into play whenever the prosecuting authority ("the receiving state") files a detainer on

---

[9]The federal government is considered a member state for purposes of the IAD.  United States v. Henson, 945 F.2d 430, 434 (1st Cir. 1991).

a prisoner serving a sentence in another jurisdiction ("the sending state").[10]

At issue here are the speedy trial provisions that the IAD imposes on the receiving state.  If the receiving state initiates the transfer through a written request for temporary custody, it must bring the prisoner to trial within 120 days of his arrival in that jurisdiction.  18 U.S.C. App. 2, § 2, art. IV(c).  If, on the other hand, the prisoner initiates the transfer through a request for final disposition, that window is 180 days from the sending state's receipt of the request.  Id. art. III(a).  If the receiving state fails to observe these strictures, it must dismiss the indictment.  Id. art. V(c);  United States v. Bozeman, 533 U.S. 146, 153 (2001).

Dowdell avers for the first time on appeal that dismissal is necessary because the IAD clock had expired before he was ever brought to trial.[11]  At no point before filing his appellate brief

_____

[10]The IAD only applies to prisoners against whom detainers have been filed.  Neither party has confirmed or denied whether a detainer was ever actually filed against Dowdell in this case, and we can find no indication in the record one way or the other. Because the issue has not been contested, and because we ultimately find no reversible error, we proceed on the assumption that a detainer was filed.  We stress, however, that parties litigating IAD claims ought not to take the existence of a detainer for granted.  See Mauro, 436 U.S. at 364 n.29 (noting that "during a typical year federal courts issue approximately 5,000 ad prosequendum writs and that about 3,000 of those are in cases in which a detainer has previously been lodged against the prisoner").

[11]Both parties leave unresolved whether Dowdell initiated the transfer through his pro se letter, triggering the 120-day clock, or whether the government did through its habeas petition,

-30-

did Dowdell so much as mention the speedy trial provisions of the IAD, despite ample opportunities. Had he done so, we have little doubt that the trial judge, who consistently demonstrated a conscientious concern for Dowdell's speedy trial rights, would have made an effort to comply.

We do not look favorably on IAD arguments that are not raised until the trial judge is no longer in a position to avoid a violation. Addressing a similar scenario arising on habeas review, the Supreme Court endorsed the lower court's observation that "[i]t would not have been difficult for the judge to advance the date of the trial or make a finding on the record of good cause, either of which would have satisfied Art. IV(c). Because the subject never came up, however, the trial judge overlooked the problem." Reed v. Farley, 512 U.S. 339, 351 (1994) (quoting Reed v. Clark, 984 F.2d 209, 213 (7th Cir. 1993)). The Court concluded that "[w]hen a defendant obscures Article IV(c)'s time prescription and avoids clear objection until the clock has run, cause for collateral review scarcely exists." Id. at 349. The same is true on direct review. A defendant who does not timely raise his IAD rights in district court forfeits those rights on appeal. United States v. Neal, 36 F.3d 1190, 1209 (1st Cir. 1994); United States v. Oldaker,

---

triggering the 180-day clock. The government argues that even the stricter 120-day clock did not expire, while Dowdell argues that even the more lenient 180-day clock did. Because of our ultimate disposition, we need not resolve the issue.

-31-

823 F.2d 778, 781 (4th Cir. 1987); <u>United States</u> v. <u>Eaddy</u>, 595 F.2d 341, 346 (6th Cir. 1979).

Dowdell now claims that his general invocation of the IAD at his initial appearance should have put the court on notice that the speedy trial provisions were in force. Yet an abstract reference to the compact does not suffice to preserve all potential challenges that might arise under it. One can forfeit a claim under one section of the IAD while preserving a different claim under another. <u>See,</u> <u>e.g.,</u> <u>Neal</u>, 36 F.3d at 1209-10; <u>Oldaker</u>, 823 F.2d at 781; <u>Eaddy</u>, 595 F.2d at 346. At his initial appearance, Dowdell referred only to his right to remain in federal custody, not the applicability of the statute's speedy trial deadline. This would be the last time that Dowdell referred to the IAD before the district court.[12] If he intended to rely on the statutory speedy trial provisions, he could have brought them to the trial judge's attention. He did not do so.

Undaunted, Dowdell argues that he did not need to spell out the letters of the IAD for the district court because his motion to dismiss for violation of the Sixth Amendment and the Speedy Trial Act effectively accomplished the same thing. He

---

[12]Dowdell places much of the blame for this silence on the government, which erroneously informed the court that Dowdell had waived his IAD rights at his initial appearance. While we do not condone the government's mistake, we note that it did not occur until July 11, 2006, well after Dowdell filed his motions to dismiss -- and well after the date when Dowdell now claims the IAD clock should have expired. The error, lamentable as it may be, cannot excuse Dowdell's forfeiture retroactively.

relies on Mauro, in which the Supreme Court ruled that the defendant's failure to invoke the IAD "in specific terms" in his speedy trial motions did not result in the waiver of an Article IV(c) claim. 436 U.S. at 364. In Mauro, the defendant had "persistently requested" a speedy trial and had "sought the dismissal of his indictment on the ground that the delay in bringing him to trial while the detainer remained lodged against him was causing him to be denied certain privileges at the state prison." Id. at 364-65. On those bases, the Court found his actions "sufficient to put the Government and the District Court on notice of the substance of his claim." Id.; accord Eaddy, 595 F.2d at 346 (finding a speedy trial motion sufficient to give notice of an IAD challenge even though it "was not framed in the precise language of the Agreement").

This case is distinguishable from Mauro in two critical respects. First and foremost, Dowdell did not have a colorable IAD claim at the time he filed the speedy trial motion. Even assuming the most defendant-favorable set of circumstances, the earliest trial deadline under the IAD would have been July 20, 2005.[13] Yet

_____

[13]The parties dispute several matters that would affect our calculation of the actual deadline: (1) whether Dowdell initiated the transfer through his pro se letter, triggering the 120-day clock, or whether the government did through its habeas petition, triggering the 180-day clock; (2) whether 78 days of excludable time under the Speedy Trial Act were automatically excludable under the IAD; and (3) whether any portion of the government's four-month lapse in responding to Dowdell's original motion to dismiss should be excludable. Giving Dowdell the benefit of the doubt on each, the clock would have run uninterrupted beginning with his initial

-33-

Dowdell filed his motion to dismiss nearly two weeks earlier, on July 8.  Thus, Dowdell is in substance arguing that the district court ought to have dismissed the indictment based on a ground that not only was absent from the motion to dismiss, but that did not even exist at the time the motion was filed.  The fallacy in this position should be clear enough.  To have the issue preserved, Dowdell would not need us to infer it from his motion to dismiss so much as to generate it ex nihilo at some later point.  This we cannot do.

Second, neither Dowdell's motion nor any subsequent communication said anything about the negative effects that the outstanding detainer might be having on his rehabilitation.  We think that element critical to the Court's holding in Mauro because, as the Court stressed, it was the attempt to ameliorate precisely those effects that prompted the IAD's passage.  See 436 U.S. at 359–60.  We do not read Mauro to mean that every speedy trial claim filed by a detainee necessarily contains an embedded IAD claim.  The Court was not propounding free association as an interpretive canon.  It was, rather, placing weight on the precise identity between the defendant's alleged prejudice and the prejudice that the IAD targets. Because Dowdell's motion never represented that the requested relief would redound to the success of his rehabilitation, we do not consider it "sufficient to put the

appearance on March 22, 2005, yielding a latest acceptable trial date of July 20, 2005.

-34-

Government and the District Court on notice of the substance of his [IAD] claim" under Mauro.

We therefore conclude that Dowdell at least forfeited any IAD claim by failing to raise it in the district court. He may very well have waived it altogether by requesting continuance after continuance that pushed the trial date to May 2007. See New York v. Hill, 528 U.S. 110 (2000) (holding that defense counsel's agreement to a trial date outside the IAD period bars the defendant from then seeking dismissal on the ground that the trial did not occur within that period). Even if the claim is not waived, our review is for plain error only. Neal, 36 F.3d at 1210. Under that standard, we would reverse only if Dowdell could prove "(1) that an error occurred; (2) that the error was clear or obvious; (3) that the error affected his substantial rights; and (4) that the error also seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Gonzalez, 570 F.3d 16, 21 (1st Cir. 2009).

Here, if there was any error to begin with, it was not clear or obvious. The clock could not have run out before the motion to dismiss was filed, and we have never before found circumstances where the IAD clock would continue to run during the pendency of a defendant's motion. On the contrary, the clock presumptively stops for the entirety of the pendency, no matter how lengthy. See United States v. Walker, 924 F.2d 1, 5 (1st Cir.

1991); cf. United States v. Staula, 80 F.3d 596, 601 (1st Cir. 1996) (holding in the Speedy Trial Act context that courts may exclude the time between the filing of the motion and the hearing on that motion, even if the delay is overlong, inexplicable, or unreasonable).  Although Dowdell does not address any period of time after the court decided his motion in July 2006, we note that the ensuing ten months of delay were entirely due to his requests for continuances and change of counsel.  As a result, Dowdell's IAD claim fails.

### C. Amendment of the Indictment

Dowdell next challenges the district court's modification of the indictment to reflect distribution of "cocaine base" rather than "cocaine."  According to Dowdell, this change constituted a material amendment that deprived him of his right to presentment of charges to a grand jury.  As we have explained above, the district court treated the proposed change as a ministerial correction to a clerical error.  Our review of this issue is de novo.  United States v. Hernandez, 490 F.3d 81, 83 (1st Cir. 2007).  Before we undertake that review, however, a bit of terminological housecleaning is in order.

The district court appears to have viewed its task as explaining why the proposed change was not a "constructive amendment."  This approach treats the word 'constructive' as a term of art for 'impermissible.'  That synonymic treatment may not be

quite right, however. A constructive amendment, as the name suggests, is _constructive_, that is, having effect in law though not necessarily in fact. Amendments to an indictment can of course be direct rather than merely constructive, and they, too, are subject to the same strict constitutional standards. See, e.g., United States v. Daraio, 445 F.3d 253, 260-61 & n.8 (3d Cir. 2006) (contrasting an alleged constructive amendment with a "formal amendment," and noting that there was no claim of "actual amendment of the indictment by a literal change of its terms"); United States v. Ford, 872 F.2d 1231, 1235-36 (6th Cir. 1989) (describing first the separate categories of amendments and variances, and then constructive amendments as a form of amendment); 1 Charles Alan Wright, et al., Fed. Prac. & Proc. Crim. § 128 (4th ed. 2008) ("Allowing the case against the accused to shift in this [constructive] manner after the indictment is returned raises the same concerns about undermining the grand jury's role as a direct amendment."). Here, the district court's amendment was anything but constructive, as it literally altered the words of the indictment's text. There may have been doubt as to whether the change was permissible, but there can be no doubt that it was actual.

In any event, the district court appears to have, understandably, enlisted the nomenclature that we ourselves have used. The common meaning of constructive amendment in our cases,

which can be traced back to United States v. Dunn, 758 F.2d 30 (1st Cir. 1985), is "'when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them.'"  Id. at 35 (quoting Gaither v. United States, 413 F.2d 1061, 1071-72 (D.C. Cir. 1969)) (emphasis added).  The use of the word "literally" suggests that the term encompasses changes that are factually true just as much as those that are legally imputed.  Yet the Gaither case quoted in Dunn was not defining "constructive amendment" in particular, but rather all amendments.  Returning to the original source yields perhaps a more sensible definition: amendments in general may be literal or in effect (and, of these, it is specifically the latter that we refer to as constructive amendments).  In any case, ever since Dunn, we have adhered to our definition of constructive amendments, most likely because they are the amendments that we most often come across.  See 1 Wright, et al. § 128 (noting that "direct attempts to amend an indictment in any substantive way are rare" and that "[i]nstead, the most common challenge in this area is a claim of 'constructive amendment'").  On the rare occasion that we do confront a direct amendment to an indictment, such as here, referring to it as constructive may obfuscate the issue.  We will therefore eschew any reference to "constructive" amendment here, where there was an express amending of the indictment.

Returning to our de novo review of the amendment, we start with the basis for the rule against amending an indictment without grand jury involvement. The prohibition is based on the Presentment Clause of the Fifth Amendment, which guarantees in relevant part that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. The Supreme Court has interpreted this provision to mean that "after an indictment has been returned[,] its charges may not be broadened through amendment except by the grand jury itself." Stirone v. United States, 361 U.S. 212, 215-16 (1960); accord Russell v. United States, 369 U.S. 749, 770 (1962) (holding that an indictment may not be "amended except by resubmission to the grand jury"); Ex parte Bain, 121 U.S. 1, 9-10 (1887).

Nevertheless, this prohibition does not extend to alterations that are "merely a matter of form." Russell, 369 U.S. at 770; see also United States v. Winter, 663 F.2d 1120, 1139-40 (1st Cir. 1981); cf. United States v. Eirby, 262 F.3d 31, 38 (1st Cir. 2001) ("[A]n indictment is sufficient if it specifies the elements of the offense charged, fairly apprises the defendant of the charge against which he must defend, and allows him to contest it without fear of double jeopardy."). Accordingly, we have allowed ministerial corrections of clerical errors in names, dates, and citations, so long as the change would not deprive the

defendant of notice of the charges against him.  See Eirby, 262 F.3d at 38 (citations); United States v. Rivera-Ruiz, 244 F.3d 263, 271 (1st Cir. 2001) (names); Jervis v. Hall, 622 F.2d 19, 22-23 (1st Cir. 1980) (dates).  Other circuits have similarly allowed corrections regarding facts that are ancillary to the charged offense.  See, e.g., United States v. Powers, 572 F.2d 146, 152 (8th Cir. 1978) (permitting change from "30-30 caliber revolver" to "30-30 caliber rifle").  In short, when a change "le[aves] the substance of the charge unaffected, the switch d[oes] not usurp the prerogative of the grand jury."  Eirby, 262 F.3d at 38.

We agree with the district court that this is such a case.  Because Dowdell was prosecuted under § 841(a)(1), which prohibits distribution of any controlled substance regardless of type, drug identity had no bearing on the substance of the charge. See United States v. Rutherford, 175 F.3d 899, 906 (11th Cir. 1999) (explaining that under § 841(a), "[t]he nature of the controlled substance neither constitutes an element of the offense nor broadens the bases for conviction, but is relevant only for sentencing purposes"); United States v. Deisch, 20 F.3d 139, 151 (5th Cir. 1994) (concluding that "the identity of the involved controlled substance as being 'cocaine base' rather than simply 'cocaine' is not an element of any section 841(a)(1) offense"). The statute would thus hold Dowdell as culpable for distribution of cocaine base as it would for distribution of cocaine powder.

Indeed, the government could technically have omitted reference to a particular controlled substance altogether.  See United States v. Lewis, 113 F.3d 487, 493 (3d Cir. 1997) (reasoning that because "identity of the substance is a sentencing factor rather than an element of the offense," an indictment under § 841(a) could theoretically avoid specifying the identity of the substance).[14]

Had the government not clarified the matter before trial, and instead proceeded under the original indictment, there would have likely been no grounds for objection whatsoever.  Certainly there would have been no constructive amendment.  See United States v. Fornilla-Castillo, 408 F.3d 52, 66 (1st Cir. 2005) (explaining that no constructive amendment present where the difference between the evidence presented and the text of the indictment does not affect any element of the offense).  At worst, we might have found a variance, although even that is far from certain.  See United States v. Wiley, 29 F.3d 345, 352 (8th Cir. 1994) (doubting any variance whatsoever would arise from difference between charge involving "cocaine" and evidence involving cocaine base because cocaine base is merely an isomer of cocaine); United States v. Deisch, 20 F.3d 139, 151 (5th Cir. 1994) (holding that "[f]or a section 841(a)(1) offense involving cocaine base[,] the indictment

---

[14]Of course, a defendant might be entitled to notice at some point as to the nature of the substance alleged.  We merely observe that under § 841(a), such notice needn't come by way of the indictment.

need only allege, and the jury need only find, that the substance was cocaine").  And had we gone so far as to find a variance, it would have been a harmless one, given all the notice that Dowdell had previously received that he was charged with distributing cocaine base rather than cocaine powder.  Cf. United States v. Twitty, 72 F.3d 228, 231 (1st Cir. 1995) ("So long as the statutory violation remains the same, the jury can convict even if the facts found are somewhat different than those charged -- so long as the difference does not cause unfair prejudice.").  It would be strange indeed to punish the government for clarifying the indictment before trial when it would have been permitted to proceed without taking any action.

Dowdell argues that the alteration was nevertheless prohibited based on two premises that are not in fact implicated here.  First, he claims that the change to cocaine base effectively exposed him to a harsher sentencing range.  Yet even if sentencing amplification were relevant, none occurred here.  It is true that under § 841(a), cocaine base normally exposes defendants to steeper sentencing ranges than does cocaine powder.  But here, Dowdell was sentenced as a career offender under Section 4B1.1 of the U.S. Sentencing Guidelines.  That provision would have applied in equal force whether he were convicted of distributing cocaine powder or cocaine base; the guideline range was a product of the 30-year statutory maximum in § 841(b)(1)(c) and Dowdell's particular

criminal history category. Thus, because we conclude that the change did not in fact alter the sentencing range, we need not resolve whether sentencing ramifications are relevant to the amendment analysis.[15]

Second, Dowdell asserts that the difference in chemical composition between cocaine powder and cocaine base means that the government would have had to proffer different evidence for each of the substances. Again, even assuming the relevance of the conclusion, its predicate is incorrect. As far as culpability under § 841(a) is concerned, cocaine base is merely an isomer of cocaine. See Wiley, 29 F.3d at 352; United States v. Pierce, 893 F.2d 669, 676 (5th Cir. 1990).[16] The government could have

_____

[15] The district court expressly found no constitutional violation because "mitigation of sentencing ramifications within the statutory maximum is not among the substantial rights protected by the right to be indicted by a grand jury." Dowdell, 464 F. Supp. 2d at 68. The "substantial rights" standard, however, is only appropriate in the context of variances. It is true that if the government had proceeded to trial with the original indictment, then variance doctrine would have been the appropriate analytical framework. But since we deal here with a direct amendment, rather than a variance, reference to the scope of the defendant's substantial rights is misplaced. In any case, we leave resolution of this issue for a day when the question is put more squarely before us.

[16] We do not go so far as to hold in this case that a trial judge is necessarily permitted simply to swap any controlled substance under § 841(a) for any other controlled substance. "Cocaine" and "cocaine base" are inherently related in ways that other potential pairings are not. Had the difference been between cocaine and Vicodin, or cocaine and marijuana, it is possible the larger gap would weigh into our analysis. But cf. United States v. Knuckles, 581 F.2d 305, 311-12 (2d Cir. 1978) (finding no substantial variance between charge of heroin distribution under § 841(a) and evidence of cocaine distribution).

-43-

proferred evidence of distribution of cocaine base and still carried its burden of proving distribution of "cocaine." Wiley, 29 F.3d at 352; Deisch, 20 F.3d at 150-51; Pierce, 893 F.2d at 676.

In sum, we hold that the district court's amendment of the indictment from distribution of "cocaine" to "cocaine base" did not affect the substance of the charges and therefore did not offend the Presentment Clause.

## D. Evidentiary Rulings

Dowdell next raises two evidentiary challenges, one concerning the admission of the police booking sheet and one concerning admission of the coconspirator's videotaped statements. We take up each in turn.

## 1. Admission of police booking sheet

Dowdell claims that the booking sheet from his July 16, 2001 arrest was inadmissible hearsay. Normally, an otherwise hearsay public record is admissible so long as it sets forth "matters observed pursuant to duty imposed by law as to which matters there was a duty to report." Fed. R. Evid. 803(8)(B). However, under what is sometimes called the "law enforcement exception," Rule 803(8)(B) retains the hearsay prohibition in criminal cases for any "matters observed by police officers and other law enforcement personnel." Id. We have interpreted this rule to mean that, as a general matter, "police reports are inadmissible in a criminal case when offered by the prosecution."

United States v. Arias-Santana, 964 F.2d 1262, 1264 (1st Cir. 1992). The Rule on its face seems equally applicable to the observations contained in a booking sheet. Nevertheless, the district court held that the law enforcement exception was not meant to encompass routine, non-adversarial documents, and on that basis found the booking sheet admissible. Although our review of rulings admitting or excluding evidence is typically for abuse of discretion, our review of the district court's interpretation of a rule of evidence is de novo. United States v. DeCologero, 530 F.3d 36, 58 (1st Cir. 2008).

We have yet to consider whether the law enforcement exception applies to an ostensibly objective, non-adversarial document such as a booking sheet. On two previous occasions, however, we have at least hinted that it should not. First, in United States v. Union Nacional de Trabajadores, 576 F.2d 388 (1st Cir. 1978), we held admissible a copy of a U.S. marshal's return despite its genesis at the hands of law enforcement personnel. We reasoned that

> [t]here is nothing to indicate that Congress meant to cut back upon the common law rule respecting sheriff's returns. A sheriff or marshal reporting the service of process is not reporting in the capacity of a police observer at the scene of a crime, nor is he ordinarily connected with the case in a law enforcement capacity. The "adversarial" circumstances which might render a law enforcement officer's observations unreliable are unlikely, therefore, to be present.

Id. at 391.  Then, in United States v. Trenkler, 61 F.3d 45 (1st Cir. 1995), we cited United States v. Brown, 9 F.3d 907, 911-12 (11th Cir. 1993), in dicta for the proposition that "Rule 803(8) does not necessarily prohibit the use of police records prepared in a routine non-adversarial setting that do not result from subjective investigation and evaluation." Trenkler, 61 F.3d at 59.

Drawing a line at routine, non-adversarial documents would best comport with the purpose for which Congress originally approved the exception.  The Rule's enactment history indicates that "the reason for this exclusion is that observations by police officers at the scene of the crime or the apprehension of the defendant are not as reliable as observations by public officials in other cases because of the adversarial nature of the confrontation between the police and the defendant in criminal cases." S. Rep. No. 1277, 93d Con., 2d Sess., reprinted in (1974) U.S.C.C.A.N. 7051, 7064.  Congress was generally "concerned about prosecutors attempting to prove their cases in chief simply by putting into evidence police officers' reports of their contemporaneous observations of crime." United States v. Grady, 544 F.2d 598, 604 (2d Cir. 1976).

Recognizing this intent, those circuits to have considered the issue have all found that the limitation in Rule 803(8)(B) does not exclude routine observations that are inherently

non-adversarial.[17]  See, e.g., United States v. Harris, 557 F.3d 938, 941 (8th Cir. 2009) (admitting testimony regarding the contents of a probation file because while the rule "does prohibit the admission of records that contain opinions or conclusions resulting from criminal investigations, it does not bar the admission of records concerning routine and unambiguous factual matters"); United States v. Weiland, 420 F.3d 1062, 1074–75 (9th Cir. 2005) (admitting Department of Corrections' packet containing fingerprints and photographs of defendant because they are records of "routine and nonadversarial matters" rather than "police officers' reports of their contemporaneous observations of crime that might be biased by the adversarial nature of the report") (internal quotation marks omitted); Brown, 9 F.3d at 911-12 (admitting property receipt prepared during booking for firearm because "the police custodian in the instant case had no incentive to do anything other than mechanically record the relevant

---

[17]Dowdell argues that there is actually a circuit split on this issue, citing to the Second Circuit's decision in United States v. Oates, 560 F.2d 45 (2d Cir. 1977).  Oates, however, was concerned not so much with what constitutes a "report" as with who constitute "law enforcement personnel," holding that the term encompassed chemists working in the U.S. customs service.  Here, there is no dispute that the police officers who drew up the booking sheet were within the class of actors envisioned by Rule 803(8)(B).  Less clear is whether the documents were within the class of evidence. On this point, even the Second Circuit has acknowledged that the Rule's language is not absolute.  See Grady, 544 F.2d at 604; United States v. Feliz, 467 F.3d 227, 236–37 (2d Cir. 2006) (autopsy reports prepared by medical examiner's office admissible because they were routinely created and did not constitute police observations).

information on the property receipt"); <u>United States</u> v. <u>Quezada</u>, 754 F.2d 1190, 1193-94 (5th Cir. 1985) (admitting an INS form indicating arrest and deportation because officials' only motivation was to "mechanically register an unambiguous factual matter"); <u>United States</u> v. <u>Orozco</u>, 590 F.2d 789, 793-94 (9th Cir. 1979) (finding no error in admission of Customs Service computer cards of license numbers of cars crossing the border since "the simple recordation of license numbers . . . is not of the adversarial confrontation nature which might cloud [an officer's] perception"); <u>Grady</u>, 544 F.2d at 604 (permitting admission of serial number and receipt of weapons because "they did not concern observations . . . of the appellants' commission of crimes," but rather were "strictly routine records").

Dowdell argues that this construction violates the Rule's plain language, which seems to bar categorically the prosecution's introduction of any and all documents prepared by the police. This much may be true. Yet, the alternative would violate the rule's plain purpose, and "[i]t is a well-established canon of statutory construction that a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute." <u>Bob Jones Univ.</u> v. <u>United States</u>, 461 U.S. 574, 586 (1983). Given the clear intent that undergirded the passage of Rule 803(8), we decline to give it a literal, unqualified meaning. <u>See</u> <u>United States</u> v. <u>Smith</u>, 521 F.2d 957, 968

n.24 (D.C. Cir. 1975) (refusing to construe 803(8)(B) according to its literal meaning because it "should be read[] in accordance with the obvious intent of Congress"); see also United States v. Pagan-Santini, 451 F.3d 258, 264 (1st Cir. 2006) (referring to Rule 803(8) as "no model of lucid drafting").  Instead, we join the other circuits in concluding that ministerial, non-adversarial information is admissible under Rule 803(8)(B), notwithstanding its documentation at the hands of law enforcement personnel.

With this interpretation of Rule 803(8)(B) in place, we now must consider whether a booking sheet would violate it.  In an unpublished decision, a panel of the Fifth Circuit answered this precise question in the negative, summarily finding that "booking information [i]s taken in a routine, nonadversarial setting." United States v. Haughton, 235 Fed. App'x 254, 2007 WL 2186250, at *1 (5th Cir. Jul. 30 2007).  We agree.  The rote recitation of biographical information in a booking sheet ordinarily does not implicate the same potential perception biases that a subjective narrative of an investigation or an alleged offense might.  A booking sheet does not recount the work that led to an arrest so much as the mere fact that an arrest occurred. As a result, unlike the investigative reports that lie at the heart of the law enforcement exception, booking sheets raise little concern that suspicion of guilt will function as proof of guilt.  We think that a police booking sheet is in this respect analogous to the INS

warrant that was the subject of the Fifth Circuit's analysis in Quezada. The Quezada court upheld the admissibility of the warrant, which recounted the defendant's prior arrest and deportation, "[d]ue to the lack of any motivation on the part of the recording official to do other than mechanically register an unambiguous factual matter." 754 F.2d at 1194. The same reasoning applies here.

Dowdell asserts that, even if this much may be true in the abstract, the particular booking sheet admitted in his trial may have been prepared with an eye toward proving his identity and as such was excludable as "indicat[ing] lack of trustworthiness." Fed. R. Evid. 803(8)(c). He offers no factual support for such a finding, instead indulging in a bare worst-case-scenario speculation that the booking officer might have colluded with Monteiro before completing the form. We need not tarry on this. An entirely conjectural and uncorroborated conspiracy theory does not transform an otherwise trustworthy document into an untrustworthy one.[18] There was no abuse of discretion.

_____

[18]We note that other circuits have placed the burden of proving untrustworthiness under Rule 803(8) squarely on the shoulders of the party opposing admission. See, e.g., Boerner v. Brown & Williamson Tobacco Co., 394 F.3d 594, 600-01 (8th Cir. 2005); Bridgeway Corp. v. Citibank, 201 F.3d 134, 143-44 (2d Cir. 2000); Zeus Enterprises, Inc. v. Alphin Aircraft, Inc., 190 F.3d 238, 241 (4th Cir. 1999); Reynolds v. Green, 184 F.3d 589, 596 (6th Cir. 1999); United States v. Loyola-Dominguez, 125 F.3d 1315, 1318 (9th Cir. 1997); Graef v. Chemical Leaman Corp., 106 F.3d 112, 118 (5th Cir. 1997). We have not yet considered who should bear the burden in this context, although our default position seems to be that it would be the party seeking admission, United States v. Bartelho,

## 2. Admission of videotapes

Dowdell's second evidentiary challenge, that the court erred in admitting White's videotaped comments to Monteiro, implicates another carve-out from the prohibition on hearsay. Federal Rule of Evidence 801(d)(2)(E) provides that any statement of a coconspirator acting during the course and in furtherance of a conspiracy is non-hearsay and, therefore, admissible for the truth of the matter asserted. In order to determine whether the factual predicates for this exception exist, the trial court must make a so-called Petrozziello ruling. See United States v. Petrozziello, 547 F.2d 20, 23 (1st Cir. 1977). A Petrozziello ruling has two stages. First, following a timely objection, the court makes a provisional finding as to whether the evidence is admissible. If so, that finding is then subject to a second and final review at the close of all the evidence. United States v. Famania-Roche, 537 F.3d 71, 75 (1st Cir. 2008). At both stages, the court applies a preponderance of the evidence standard, namely, whether "it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement

---

129 F.3d 663, 670 (1st Cir. 1997), which in this case is the government. Regardless, even if the government were to bear the burden here, neither the booking sheet itself nor the known facts surrouding its preparation suggest untrustworthiness by a preponderance of the evidence. "The government's burden [of proof] . . . does not mean . . . that it must disprove all of the defendant's alternative theories, no matter how speculative or implausible." United States v. Ribeiro, 397 F.3d 43, 53 (1st Cir. 2005).

was made, and that the statement was in furtherance of the conspiracy." Id.

Finding such a preponderance here, the district court admitted White's statements. Dowdell now argues that the prosecution's evidence established nothing more than friendship and proximity with the declarant, rather than a joint venture to sell controlled substances. Assuming this argument was properly preserved, we must still accept the district court's findings of fact unless they were clearly erroneous.[19] See United States v. Thompson, 449 F.3d 267, 273 (1st Cir. 2006). This heavy burden is

_____

[19]There may be some uncertainty as to the proper standard of review for Petrozziello rulings, due to recent cases that employ the abuse of discretion standard. See, e.g., United States v. Vazquez-Botet, 532 F.3d 37, 65 (1st Cir. 2008); United States v. Colon Diaz, 521 F.3d 29, 36 (1st Cir. 2008); United States v. Rivera-Hernandez, 497 F.3d 71, 82 (1st Cir. 2007). But we long ago said in United States v. Patterson, 644 F.2d 890, 894 (1st Cir. 1981), and have endorsed on countless subsequent occasions, that we review a trial court's Petrozziello determination for clear error. Every other circuit has long been in accord. See United States v. Edmond, 52 F.3d 1080, 1110 (D.C. Cir. 1995); United States v. Gessa, 971 F.2d 1257, 1260-61 (6th Cir. 1992); United States v. Cruz, 910 F.2d 1072, 1081 n.11 (3d Cir. 1990); United States v. Bouck, 877 F.2d 828, 831 (10th Cir. 1989); United States v. Jackson, 863 F.2d 1168, 1172 (4th Cir. 1989). United States v. Kaden, 819 F.2d 813, 820 (7th Cir. 1987); United States v. Rahme, 813 F.2d 31, 36 (2d Cir. 1987); United States v. Silverman, 771 F.2d 1193, 1199 (9th Cir. 1985); United States v. Harshaw, 705 F.2d 317, 320 (8th Cir. 1983; United States v. Bulman, 667 F.2d 1374, 1379 (11th Cir. 1982); United States v. Perry, 624 F.2d 29, 30 (5th Cir. 1980). See also Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 8:62 (3d ed. 2007) (referring to "almost universal agreement" throughout the federal judiciary on use of clear error review). In the Petrozziello context, it is likely that review for abuse of discretion applies only to the district court's ultimate decision whether to admit or exclude the statement, and not to the underlying factual findings.

carried only when "although there is evidence to support [the finding], the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. Where the evidence is susceptible of two plausible interpretations, the trier of fact's choice between them cannot be clearly erroneous." United States v. Newton, 326 F.3d 253, 257 (1st Cir. 2003). A heavier burden still awaits those attempting unpreserved challenges, which are reviewed only for plain error. United States v. Aviles-Colon, 536 F.3d 1, 14 (1st Cir. 2008). Though the parties disagree as to whether Dowdell successfully preserved his challenge by renewing his objection at the close of all the evidence, the dispute is ultimately irrelevant. Even adopting the less deferential standard, we would still affirm the district court's ruling.

It is well established that "the preponderance of evidence required for the introduction of an out-of-court statement under Rule 801(d)(2)(E) must necessarily comprise more than the weight of the statement itself." United States v. Sepulveda, 15 F.3d 1161, 1181 (1st Cir. 1993). An alleged coconspirator's declarations are thus insufficient in isolation. At the same time, however, the court may consider the hearsay statements themselves in the context of other extrinsic, corroborating evidence. Bourjaily v. United States, 483 U.S. 171, 180-81 (1987); United States v. Manqual-Garcia, 505 F.3d 1, 8 n.5 (1st Cir. 2007). Such

corroboration was amply available here. When Monteiro first saw White on July 6, White was counting cash with Dowdell. Moments later, when White agreed to make the initial sale to Monteiro, his first action was to walk over to Dowdell and consult with him. Then, on July 16, Dowdell sold drugs to Monteiro when White was unavailable. These facts, coupled with White's statements themselves, adequately supported a finding of a conspiracy by a preponderance of the evidence. Accordingly, the district court did not clearly err in its Petrozziello ruling.

Dowdell further maintains that even if the statements themselves were admissible, introducing them on video nevertheless violated Federal Rule of Evidence 403, which provides that otherwise admissible evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Specifically, he argues that a printed transcript would have been less prejudicial because it would not have allowed the jury to see White, who, according to Dowdell, "looks like an obvious drug addict and just makes a very bad impression." But the mere fact that Dowdell might have fared better without the video is not in itself cause for exclusion. "By design, all evidence is meant to be prejudicial; it is only unfair prejudice which must be avoided." United States v. Rodriquez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989) (emphasis in original). The trial court has wide latitude in determining when the amount of unfair prejudice has

tipped the scale too far. "Only rarely -- and in extraordinarily compelling circumstances -- will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." United States v. Shinderman, 515 F.3d 5, 17 (1st Cir. 2008) (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988)).

In this case, in which the reliability of Monteiro's identification of Dowdell as Smoke was hotly contested, any contextual inferences available from a visual record would be highly probative. Whatever minimal unfair prejudice might have resulted from seeing White's physical appearance, it did not overcome this probative value. In any event, it was Dowdell, not the government, who chose to associate himself with White. We discern no abuse of discretion.

### E. Sentencing

This brings us to the last of Dowdell's litany of arguments. He asks us to vacate his 198-month sentence because the government allegedly reneged on a promise not to seek a sentence greater than 20 years. A sentence of 198 months is, of course, itself less than 20 years. Dowdell's theory is that the sentence was nevertheless voidable because the government's filing of an information of prior conviction, which increased the minimum guideline sentence from 210 to 262 months, raised the baseline from

which the trial court would have varied downward.  Because this issue was not raised at sentencing, we review for plain error, United States v. Matos, 531 F.3d 121, 122 (1st Cir. 2008), although we think this argument ultimately unavailing under any standard of review.

Dowdell does not make clear what jurisprudential basis would merit vacating a sentence in this context.  He directs our attention to Santobello v. New York, 404 U.S. 257 (1971), United States v. Gonczy, 357 F.3d 50, 53 (1st Cir. 2004), United States v. Rexach, 896 F.2d 710, 714 (2d Cir. 1990), and United States v. Giorgi, 840 F.2d 1022, 1026 (1st Cir. 1988), but none is on point.  Those cases all deal with a prosecutor's breach of an assurance made during a plea agreement, not an isolated comment made during a pre-trial hearing in a case in which the defendant received his full panoply of constitutional trial rights.  Cf. Gonczy, 357 F.3d at 53 (explaining that the "meticulous standards of both promise and performance" that govern prosecutors in plea agreements stem from the defendant's waiver of fundamental constitutional rights that would otherwise be present in a jury trial).

Instead, we understand Dowdell to be advancing a theory of estoppel.  The lack of any briefing on this issue renders the issue waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  Even if not waived, the argument is not supported by the record.  The government did not, as Dowdell argues,

affirmatively commit itself to the original 20-year statutory maximum. Rather, it offered a descriptive (and accurate) statement of sentencing law. The government explained to the court that the proposed change to the indictment would not violate Apprendi in that the statutory maximum would remain the same irrespective of the controlled substance alleged in the indictment. See Apprendi v. New Jersey, 530 U.S. 466 (2000). At the time, that statutory maximum was 20 years. Upon the filing of the information, it became 30 years. Although the number changed, the substance of the government's remark -- that drug identity would have no impact on the statutory maximum -- remained just as applicable. Thus we disagree with Dowdell's assertion that the government bound itself to any particular sentencing recommendation to begin with. Moreover, even had such a promise existed, there is no evidence in the record to suggest that the court gave any weight whatsoever to the government recommendation at sentencing. Dowdell thus fails to show a reasonable probability that he would have received a more lenient sentence but for the alleged error. See Matos, 531 F.3d at 122-23. For all of these reasons, we find no flaw in Dowdell's sentence.

## III. Conclusion

The appellant's conviction and sentence are **AFFIRMED**.